# United States Court of Appeals
## For the First Circuit

No. 04-2386

UNITED STATES OF AMERICA,

Appellee,

v.

JACINTA A. THOMAS, a/k/a JACINTA A. CRASTOUN,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

---

Before

Torruella and Lynch, Circuit Judges,
and Woodcock,[*] District Judge.

---

Irma R. Valldejuli for appellant.
Mariana E. Bauzá-Almonte, Assistant United States Attorney,
with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

---

October 27, 2006

---

[*]Of the District of Maine, sitting by designation.

**WOODCOCK, District Judge**.  In 2003, following a five-day jury trial in the United States District Court in Puerto Rico, Jacinta Thomas was found guilty of smuggling and possession of illegal drugs.  Concluding that the evidence is sufficient to sustain the verdicts and that the trial court properly refused to allow extrinsic evidence on a collateral matter, we affirm.

## I.   Statement of Facts

### A.   Mr. Smalls and the Box of Pink Lady

On July 6, 2002, a confidential informant (CI) contacted the San Juan, Puerto Rico office of the United States Customs Service (Customs) concerning a shipment of narcotics being transported from St. Martin, Netherlands, Antilles into San Juan. The CI, a crew member from a Caribbean cargo vessel, had been a paid informant since 1998 and had previously provided Customs with information concerning narcotics smuggling.  He reported that a box of wine containing narcotics was going to be entrusted to him to transport from St. Martin to Pier 10 in the port of San Juan. Later that day in St. Martin, a man by the name of Mr. Smalls[1] approached the CI.  Smalls confirmed that he wanted the CI to transport a box of wine to San Juan, told the CI that one of his workers would deliver the wine to him, and slipped the CI two telephone numbers to contact upon his arrival in San Juan.  Later, a worker brought the CI a sealed white carton box indicating that it contained wine and marked "Pink Lady," which the CI stowed

_____

[1]The parties refer either to Mr. Small or Mr. Smalls; this opinion uses "Smalls."

securely in his cabin.  After leaving St. Martin, the vessel set sail for the port of San Juan.  Awaiting his arrival at Pier 10 was a surveillance team from Customs.

### B.  The Vessel Arrives at Pier 10

On July 9, 2002 at about 7:00 a.m., the cargo vessel arrived at Pier 10 in San Juan harbor.  After the CI contacted Customs, agents boarded the vessel, debriefed the CI, and opened the box labeled Pink Lady.  Inside the box, the agents observed pelletized objects in brick-shaped packages and other objects shaped like shoe soles inside bags.  They resealed the box and instructed the CI to call the numbers Smalls had given him.

When the CI called the first number, a woman answered the phone.  After the CI asked for Smalls, she asked him to call back in five minutes.  When he did so, he spoke directly to Smalls, who said he would send a woman who was well known in the pier area to pick up the box.  The CI called a third time and spoke to a woman who confirmed that she was going to come to the port to pick up the box.  The telephone number the CI had called was listed to the Appellant.

### C.  Jacinta Thomas and Pier 10

The morning of July 9, 2002, Thomas, a resident of Santurce, Puerto Rico, got in her Ford Taurus and drove to Pier 10. She arrived sometime between 7:00 a.m. and 9:00 a.m.[2] and immediately came under Customs surveillance.  After Thomas entered

---

[2]The Agents disagreed about precisely when she arrived: one said between 7:00 and 7:15 a.m.; another said between 8:00 and 9:00 a.m.; and, a third said 8:20 a.m.

-3-

the dock area, she parked her car and got out. After exiting her vehicle, she answered her cell phone and then looked toward the cargo vessel. Customs agents observed her frequently looking toward the freight and cargo area, as if searching for someone specific. Unlike others with business in the port, she did not enter any offices, was not carrying any documents, and repeatedly used her cell phone. She then reentered her vehicle and left the dock area for ten to fifteen minutes.

Upon her return, she parked again, got out of her car, and sat in a chair, chatting with people passing by. This time she remained on the dock for several hours. While she was there, the CI placed four calls to her cell phone to establish contact and to coordinate delivery of the box. These calls took place at 10:30, 10:50, 11:10, and 11:26 a.m. and as these calls were made, surveillance confirmed that Thomas was using her cell phone. It took hours to coordinate the delivery of the box to Thomas, because Thomas did not want to pick up the box at the end of the pier, but instead wanted the box delivered to her car. Ultimately, the CI arranged to have one of his employees take the box on a forklift to Thomas's car. When the forklift operator arrived at her car, Thomas got up from her chair, pointed to the side of the car, walked in front of the forklift operator, and opened the door to the driver's seat. The forklift operator placed the box in the rear seat behind the driver.

After the box was placed in her vehicle, Thomas stayed near her car momentarily and then walked toward the LADY ROMNEY,

another cargo vessel. Thomas returned to her car accompanied by another woman, who was wearing a type of hair net commonly worn by cooks. This woman joined Thomas approximately thirty seconds before Thomas began to drive out of Pier 10. As Thomas was driving out of Pier 10, Customs agents stopped her. After identifying himself, Agent Ritchie Flores asked Thomas whether she had any cargo or foreign property in her vehicle. Thomas replied that she had a box in the rear seat that had come from Anguila. Flores was aware, however, that the wine box had originated in St. Martin and had not traveled to Anguila. Flores asked if he could search both the box and Thomas; she consented. Inside the wine box, Flores discovered brick-shaped packages wrapped in newspaper and covered in grease and inside these packages were bricks of heroin and cocaine base, containing 3.96 kilograms of heroin hydrocholoride and 4.922 kilograms of cocaine base.[3] There was no wine in the box.

### D. Customs Procedure

Under Customs regulations, all incoming foreign cargo must be manifested and declared, including merchandise brought by crew members. To exit the port with foreign merchandise, the recipient must proceed to Customs with the required forms and receive clearance. Thomas did not have any paperwork to accompany the box of wine.

### E. Narcotics Smuggling

The value of one kilogram of heroin was $90,000 wholesale

---

[3]The parties stipulated to these drug amounts at trial.

and $270,000 retail, and the value of one kilogram of cocaine base was $17,500 wholesale and $52,000 retail.  The range of value for the entire shipment, therefore, was between $442,535 wholesale and $1,325,144 retail.  At trial, a DEA task force member expressed the view that, because of the value of the shipment, the owner of the drugs would only assign the job of picking up the drugs to a highly trusted member of the drug organization.  He also testified that a drug organization would never use a person who was unaware of what was being transported.

### F.  Jacinta Thomas's Defense

Thomas's defense was, in short, that the cook did it. Thomas took the stand during her trial and testified that every Tuesday she had gone to Pier 10 to meet the LADY ROMNEY and to pick up its cook, Claudette Henriquez.  In exchange for $100.00, Thomas would then take Henriquez in her car to various wholesale businesses in San Juan, such as Costco and Sam's, where Henriquez would purchase food and other supplies for the vessel.

Thomas testified that she had arrived, as usual, at Pier 10 the morning of Tuesday, July 9, 2002, to pick up Henriquez. When she arrived, however, Jack, the captain of the LADY ROMNEY, asked her to take his girlfriend to the beauty parlor, which Thomas did, returning shortly thereafter to pick up Henriquez.  After Thomas returned to Pier 10, Henriquez asked if she could borrow Thomas's cell phone and disappeared inside the LADY ROMNEY.  Thomas waited for Henriquez to reappear and ultimately went inside the vessel to find Henriquez, who told her that she had to finish

cooking for the crew that day and would then be ready to leave. Henriquez also told Thomas that she had a box of liquor to take out. Thomas replied that this would be no problem. Thomas returned to the dock, where she continued to wait for Henriquez. As Thomas waited, she placed a number of calls on her cell phone, including to her daughter and her own clients.[4]

Thomas agreed that while she was waiting for Henriquez, she received a telephone call from someone, informing her that Henriquez had asked him to call her about the box of wine and that he needed her permission to deliver the box, since it was her car. Thomas agreed, knowing that Henriquez had informed her about the wine. This same person called a second time and told her to come pick up the box; Thomas refused and instead told him to bring the wine to her vehicle. This took some time and Thomas went back inside the LADY ROMNEY to hurry Henriquez along. When she came out, a person had arrived at her vehicle with a forklift and the wine. Thomas told him where to place the box. Henriquez emerged from the LADY ROMNEY, got into Thomas's car, and they both left Pier 10.

As they were leaving, they were stopped by Customs Agents. Thomas immediately conceded that they had brought a box of wine from the docks and when she was asked for papers for it replied: "[T]hey just bring me the box but they didn't give me ... any paper or anything." She consented to a search of the box.

At the police station, after the Agents detained both

_____

[4]Thomas operates a beauty salon from her home.

Henriquez and Thomas, Thomas informed them that she was unaware of the contents of the box, but thought it had come from Anguila, because she knew that was where Henriquez was coming from. At the time of her arrest, Thomas had $83.00 in her pocketbook. The police released Henriquez that same day. Henriquez subsequently resigned her cook's job, left the Island, and disappeared.

### G. The Progress of the Case

On August 7, 2002, Thomas was indicted for (1) the knowing and intentional importing into the United States of heroin and cocaine base in violation of 21 U.S.C. § 952(a); and, (2) the knowing and intentional possession of heroin and cocaine base with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). The case was tried before a Puerto Rican jury from July 28, 2003 to August 4, 2003, and the jury returned guilty verdicts on both counts. After Rule 29 motions were denied, Thomas filed a timely appeal on September 9, 2004.

### II. Discussion

### A. Sufficiency of the Evidence

Thomas's main challenge is directed to the sufficiency of the evidence on an essential element of the offense: whether she "knowingly and intentionally" either possessed or imported illegal narcotics into the United States. 21 U.S.C. § 841(a)(1), 952(a). She strenuously argues that the sole evidence tending to establish that she had actual knowledge that illegal narcotics were contained within the box marked Pink Lady is the testimony of a DEA agent to the effect that drug smugglers do not generally entrust large

amounts of drugs to innocents. She contends that even if the testimony of the CI were credible, it is a leap too far to conclude that Smalls, who never testified, told her that the box contained illegal drugs or that she otherwise knew or should have known that it did. In effect, she argues that, though the evidence could easily sustain a guilty verdict if charged with aiding and abetting the attempted smuggling of a few bottles of Pink Lady wine, it cannot sustain a verdict for smuggling large quantities of heroin and cocaine base.

While we review Rule 29 determinations de novo, we will affirm the conviction if, "after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. Carucci, 364 F.3d 339, 343 (1st Cir. 2004) (quoting United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003)). "All 'reasonable evidentiary inferences' are to be drawn 'in harmony with the verdict,' and 'all issues of credibility' are to be resolved 'in the light most favorable to the government.'" United States v. Washington, 434 F.3d 7, 15 (1st Cir. 2006) (quoting United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004)). Our task, therefore, is not to make an original determination as to whether Thomas possessed the requisite knowledge but, rather, to determine whether a rational jury could have found that Thomas did so.

Viewed in the light most favorable to the government, the

evidence against Thomas is substantial.  First, the jury could have readily believed the CI, who testified that Smalls had given not his own, but Thomas's telephone number to the CI, that Smalls answered when the CI called Thomas's number earlier that morning, that Smalls said he was sending someone to pick up the box, that Thomas was the only person who then appeared, that Thomas was the person answering the CI's telephone calls at Pier 10, and that she directed the CI to have the box delivered to her car.  Indeed, Thomas's own telephone records confirmed the calls from the CI to her phone, including calls the CI had made before she arrived at Pier 10.

Second, the size of this operation, exceeding $1,300,000 in street value, makes it less plausible that Thomas was wholly ignorant of the criminal operation.  The jury could have accepted the DEA agent's testimony that smuggling operations, like Smalls's, involving millions of dollars do not take unnecessary risks, instead opting for trusted and close associates, like Thomas, who are aware of the high stakes.  Therefore, the jury could have reasonably concluded that Smalls knew Thomas well enough to use her cell phone number as a contact, was present with her when the CI made the calls, and sent her to pick up this valuable illegal shipment.

Third, Thomas was certainly aware, at the very least, that she was sneaking something into Puerto Rico.  The box was emblazoned Pink Lady on the outside, proclaiming its purported contents, and smugglers rarely openly advertise the true nature of

the smuggled goods.  Further, as opposed to the high value of narcotics, there is no evidence that the value of the box of wine justified the considerable time and energy she expended that morning.  Under the willful blindness instruction, Thomas could "be charged with knowledge of a fact if she deliberately closed her eyes to something that otherwise would have been obvious to her."[5] United States v. Cheal, 389 F.3d 35, 42 n.7 (1st Cir. 2004).  Given her striking lack of curiosity as to the actual contents of the box that had consumed her entire morning, the jury could have rationally concluded that Thomas was at the least willfully blind to the fact that she was smuggling narcotics.

It is true that Thomas is an unlikely drug dealer or smuggler.  A native of St. Kitts and a twenty-seven-year resident of Puerto Rico, Thomas is a forty-four-year old single mother of nine children, ranging in ages from ten to twenty-five.  By all appearances, she is hard-working, operating a beauty parlor from her modest home and, on weekends, running a small entertainment bar, Caribbean Flavor Pub, where she serves food and liquor.  There is no sign of the accumulation of any ill-gotten gains.  To the contrary, one of the telephone calls she had received while waiting

_____

[5]Here, the trial judge properly instructed the jury that Thomas's "willful blindness" could satisfy the knowledge element. To infer knowledge, the jury had to find first that the defendant "was aware of a high probability of 'the fact in question,' which in this case would be that there were controlled substances inside the box that was marked 'Pink Lady' ... and second, that the defendant consciously and deliberately avoided learning of the fact.  That is to say, that defendant willfully made herself blind to the fact."  See United States v. Gabriele, 63 F.3d 61, 66 n.6 (1st Cir. 1995).

-11-

at Pier 10 relayed the unhappy news that the electric company was threatening to cut off service for failure to pay. Finally, on arrest, she was carrying a relatively modest sum of money. It is also true that there was no direct evidence that she was aware of the contents of the box. It is, however, within the unique province of the jury to sift through conflicting evidence, assess the credibility of the witnesses, and find facts. As the Supreme Court stated:

> A fundamental premise of our criminal trial system is that "the jury is the lie detector." Determining the weight and credibility of witness testimony, therefore, has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men."

United States v. Scheffer, 523 U.S. 303, 313 (1998) (citation omitted); see also Blake v. Pellegrino, 329 F.3d 43, 47 (1st Cir. 2003) ("It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses ... and draws the ultimate conclusions as to the facts." (omission in original) (quoting Boston & Me. R.R. v. Cabana, 148 F.2d 150, 152 (1st Cir. 1945) (internal quotation marks omitted)).

Ultimately, it is Thomas's own trial testimony that seals her fate on appeal. At trial, Thomas proclaimed her total innocence and insisted that the entire plot was concocted by the cook. She maintained that she was there only to take the cook shopping and that it was the cook who duped her into transporting the box of Pink Lady. What may have been plausible at trial,

-12-

however, becomes untenable on appeal, once the evidence is viewed in the light most favorable to the government. The government's evidence establishes that Thomas was implicated to some degree with Smalls in the scheme and her protestations of absolute innocence cannot be reconciled with the weight of the collective evidence.[6] If Thomas had admitted the bulk of the government's evidence but denied the final crucial element -- that she knew the box contained narcotics -- her trial testimony would at least be consistent with her current legal argument. But, once the case is cast in the light most favorable to the government, the evidence exposes an inexplicable inconsistency between what the government proved and what Thomas stated under oath. In view of this inconsistency, the jury could well have found Thomas's testimony incredible and found that she was neither hermetically sealed from the true nature of the criminal enterprise nor that the cook was the actual culprit. United States v. Soto-Beniquez, 356 F.3d 1, 52 (1st Cir. 2004) ("[P]lausible credibility determinations cannot be disturbed on appeal.").

In sum, when viewed in the light most favorable to the government, a "rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." Carucci, 364 F.3d at 343.

---

[6]This evidence includes Smalls's use of her cell phone number, her presence with Smalls when the CI made the calls earlier that day, her arrival as the courier promised by Smalls, the documented calls from the CI to her cell phone, both before and after she arrived at Pier 10, her unusual conduct on the Pier, and her odd insistence that the box be delivered to her vehicle.

## B. Rule 608(b)

We need not tarry long with the second issue. Defense counsel was aware from handling other matters that Modesto Augusto Mesa, a convicted felon, had previously accused the CI of retaining for himself part of a drug shipment in another case in which the CI had participated as an informant. On cross-examination, defense counsel sought to question the CI as to whether Mesa's accusation was true, and the district court allowed it. However, when questioned about the prior bad act, the CI flatly denied it. After the CI's denial, defense counsel asked leave to call Mesa as a witness in an effort to prove that the CI was lying. The district court refused permission. Thomas contends the trial court's refusal violated Rule 608(b) and infringed her Sixth Amendment right of confrontation.

Thomas misses the mark. First, the rules of evidence do not require the admission of such extrinsic evidence. Rule 608(b) provides in part that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness ... may not be proved by extrinsic evidence." Fed. R. Evid. 608(b). It is "well established that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter." United States v. Beauchamp, 986 F.2d 1,3 (1st Cir. 1993). Thus, "it is often said that when a witness testifies to a collateral matter, the examiner must take [the] answer." Id. (internal quotation marks omitted). Even if the proposed testimony was proffered to show bias rather than to

-14-

attack the CI's veracity, it is nevertheless inadmissible under a Rule 402 and Rule 403 analysis. See Fed. R. Evid. 608 Advisory Committee Note 2003 Amendment("By limiting the application of the Rule to proof of a witness' character for truthfulness, the amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rule 402 and 403.").

Second, turning to the Confrontation Clause question, in the post-Crawford v. Washington, 541 U.S. 36 (2004), era, a "balancing of interests" is still called for and the result must depend "upon the circumstances of the case." White v. Coplan, 399 F.3d 18, 24 (1st Cir. 2005). Here, in refusing to allow a trial within a trial on a collateral matter, the trial court struck the proper balance. United States v. Coplin, No. 05-2077, 2006 U.S. App. LEXIS 23910, *21 (1st Cir. Sept. 20, 2006) (trial courts have "undeniable authority ... to place reasonable limits on cross-examination in order to cut off protected discussion of marginally relevant subjects.").

## III. Conclusion

The judgment of the district court is affirmed.