**UNITED STATES, Appellee,**

v.

**John BILIS, Defendant, Appellant.**

**No. 98–1895.**

United States Court of Appeals,
First Circuit.

Heard Jan. 8, 1999.

Decided March 10, 1999.

---

Roger A. Cox, with whom Cox & Cox, was on brief, for appellant.

Heidi E. Brieger, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellee.

Before TORRUELLA, Chief Judge, ALDRICH and CUDAHY,* Senior Circuit Judges.

TORRUELLA, Chief Judge.

On September 18, 1997, a grand jury returned an indictment charging defendant-appellant John Bilis with violating 21 U.S.C. § 856(a)(2) by knowingly and intentionally managing and controlling a building for the purpose of the unlawful distribution and use of controlled substances. A trial commenced on April 6, 1998 and the jury ultimately returned a guilty verdict. The district court sentenced Bilis to a twenty-one month term

---

* Of the Seventh Circuit, sitting by designation.

of imprisonment, to be followed by twenty-four months of supervised release. On appeal, Bilis claims that the district court erred in giving a willful blindness jury instruction. We affirm.

## I. BACKGROUND

We recite the facts in the light most favorable to the verdict. *United States v. Cunan*, 152 F.3d 29, 32 (1st Cir.1998) (quotations omitted). In the fall of 1996, the Webster Police Department (the "WPD") received information about narcotics trafficking at the High Street Café in Webster, Massachusetts. Specifically, the WPD received information that on September 19, 1996, an individual known as William Armstrong would be selling drugs at the High Street Café. Pursuant to this information, Webster police officers went to the bar, located Armstrong on the street outside, and followed him into the bar. Armstrong was then arrested on outstanding warrants. Subsequent to Armstrong's arrest, WPD officers seized a sandwich bag containing cocaine from the corner space between the men's restroom and the bar.

At the time of Armstrong's arrest, Bilis, the owner and bartender of the High Street Café, was working behind the bar. WPD officers questioned Bilis about the bag of cocaine. Bilis indicated that he knew nothing about it. WPD officers then warned Bilis that he could be at serious risk of losing his liquor license due to possible drug violations.

Shortly after this incident, Bilis arranged to meet with WPD officers to discuss suspected drug dealing at the High Street Café. During this meeting, Bilis suggested that the WPD install a surveillance camera in the bar. Bilis also agreed to the possible placement of an undercover officer in the bar to investigate the drug problem. WPD officers asked Bilis to name the drug dealers who frequented his bar. Bilis responded: "You know who they are." When the officers named several individuals they suspected, Bilis nodded. Following this meeting, WPD officers dropped by the High Street Café several times a week. During those visits, Bilis identified several bar patrons he suspected were drug dealers.

Three months later, beginning in December 1996, the WPD launched an undercover investigation of drug dealing at the High Street Café. Officer Stephanie Healy, a WPD undercover officer, began frequenting the café to gain intelligence and to make controlled purchases from suspected drug dealers. Bilis was not informed of this undercover investigation and did not know that Healy was an undercover officer.

Beginning on February 5, 1997, Healy made numerous controlled cocaine purchases at the High Street Café. At trial, Healy testified that there were so many drug dealers working at the High Street Café that the drug business environment could be characterized as "competitive." Healy described the café as a bar with several stools, four or five tables, and a pool table. Healy testified that she normally made controlled cocaine purchases directly in front of the bar, at one end of the tables, or in the women's restroom. Bilis was present in the bar almost every night.

Officer Healy testified that on February 20, 1997, she overheard Bilis tell Michael Plasse, a suspected drug dealer, to "clean up" because he did not want the police to see any plastic baggies lying around on the floor. Bilis instructed Plasse to flush all baggies down the toilet.

In April 1997, the United States Drug Enforcement Administration (the "DEA") took over the WPD investigation. On April 30, 1997, DEA agents conducted surveillance of the High Street Café while Healy made a controlled purchase of cocaine inside the bar. During Healy's purchase a DEA agent was located in an undercover surveillance van parked outside the bar. At trial, Healy testified that while she was in the bar it became clear from the commotion that some bar patrons had spotted the DEA surveillance van. Tina LeMay, a bar patron, testified that whoever was tending bar that night closed the shutters of the window overlooking the street after patrons spotted the van. William Sblacers, another patron, testified that Bilis warned him to be careful because there was a police surveillance van parked outside.

On May 29, 1997, Bilis became a target of the DEA investigation. On that date, Healy approached Sblacers at the High Street Café to make a controlled cocaine purchase. Sblacers informed Healy that he did not have any cocaine but that he and several others—including Bilis—were waiting for a delivery from cocaine distributor Stephen Reyes.

On August 29, 1997, Healy entered the High Street Café to make a controlled cocaine purchase from Reyes. Healy sat at the bar, where she was joined by Bilis. Healy asked Bilis if he knew of Reyes's whereabouts. Bilis told Healy that he had seen Reyes earlier in the week, but he did not know where he was now. Healy then asked Bilis if he knew whether there was anyone else in the bar who could get her "a little something."[1] In response, Bilis looked around the bar and replied: "No, I do not. That's what I'm down here for."

At trial, Sblacers testified that he was arrested on September 27, 1997 and was currently in jail on drug charges. Sblacers hoped to "get a break" at sentencing because of his testimony for the government. According to his testimony, Sblacers usually sold at least six packages of cocaine to High Street Café customers between midnight and 1:00 AM three to four times per week. Sblacers testified that Bilis bought cocaine directly from him at the bar. Sblacers testified that he also sold cocaine to Bilis through another bartender, Lynn DuFault. At one point, Bilis asked Sblacers to talk to "the guys" and tell them to be more careful because he did not want to lose his liquor license. Bilis also warned Sblacers about the DEA surveillance van parked outside of the bar on April 30, 1997.

Tina LeMay was also arrested on September 27, 1997 for possession of controlled substances with intent to distribute. At trial, she testified that she passed cocaine over the bar to Bilis in a folded dollar bill. According to her testimony, she also sold cocaine to Bilis through Lynn DuFault. LeMay testified that although drug dealing at the High Street Café was covert, she did not try to conceal it from Bilis.

Leonardo González testified that he sold drugs to Bilis two to three times a week, so many times that "it would be impossible to count." González further testified that he observed Bilis watch as a bar patron tasted cocaine from an open bag in the men's room. Finally, González testified that Bilis sold him a $2,000 lottery ticket so that González could "clean" his drug proceeds. At the time of his testimony, González was serving a three to five year sentence in Massachusetts for drug-related offenses.

During his trial testimony, Bilis denied having ever participated in the sale of illegal drugs. Specifically, he denied having ever purchased cocaine from Sblacers, LeMay or González. Bilis further testified that he never observed any hand-to-hand drug transactions at the bar. He denied seeing a bar patron taste cocaine from a plastic bag in the men's room. He denied warning anyone about a police surveillance van parked outside the bar on April 30, 1997. Finally, he denied having ever suggested that the sale of the lottery ticket would "clean" González's drug money.

With respect to the plastic baggies, Bilis testified that he recalled seeing Plasse exit the men's room with plastic tops or knot tops, but that he did not specifically know that Plasse was selling cocaine. Bilis admitted that he was concerned about the plastic bags but refused to admit that he knew the baggies contained (or had contained) cocaine. Rather, Bilis testified that he merely "speculated" that drug dealers were selling drugs in his bar. Throughout his testimony, Bilis maintained that he did not have any direct, actual knowledge of drug activity in his bar.

At the conclusion of trial, the government filed its proposed jury instructions, requesting that the district court give the jury a willful blindness instruction. At the jury charge conference, defense counsel objected to the government's request. At the start of the next day's proceedings, the district judge announced his decision to grant the government's request and give the willful blindness instruction. At the conclusion of the jury

---

**1.** At trial, Healy testified that she could not recall whether she actually used the word "drugs" or if she asked Bilis whether he knew anyone who could get her "a little something."

instructions, defense counsel renewed his objection to the instruction. Bilis now appeals.

## II. DISCUSSION

In order to convict Bilis of violating 21 U.S.C. § 856(a)(2), the government needed to prove three elements beyond a reasonable doubt: (1) that Bilis managed or controlled the High Street Café; (2) that Bilis knowingly and intentionally made the High Street Café available for use to others; and (3) that Bilis made the High Street Café available for the purpose of unlawfully possessing or distributing a controlled substance. *See* 21 U.S.C. § 856(a)(2). The government requested the willful blindness instruction in order to prove the second element. Pursuant to the government's request, the district judge instructed the jury that:

> the word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

> In deciding whether the defendant acted knowingly, you may infer that he had knowledge of a fact if you find that he deliberately closed his eyes to a fact that otherwise would have been obvious to him. In order to infer knowledge, you must find that two things have been established; first, that the defendant was aware of a high probability of unlawful possession or distribution of controlled substances in the High Street Café; and, second, that he consciously and deliberately avoided learning of that fact; that is to say, the defendant willfully made himself blind to that fact.

> It is entirely up to you to determine whether Mr. Bilis deliberately closed his eyes to the fact and, if so, what inference, if any should be drawn. However, it is important to bear in mind that mere negligence or mistake in failing to learn the fact is not sufficient. There must be a deliberate effort to remain ignorant of the fact.

Because Bilis made a timely objection to this instruction, we review for abuse of discretion. *See Cunan*, 152 F.3d at 39.

This court has previously identified the circumstances warranting a willful blindness instruction:

> A willful blindness instruction is warranted if (1) the defendant claims lack of knowledge; (2) the evidence would support an inference that the defendant consciously engaged in a course of deliberate ignorance; and (3) the proposed instruction, as a whole, could not lead the jury to conclude that an inference of knowledge was mandatory.

*United States v. Gabriele*, 63 F.3d 61, 66 (1st Cir.1995). More specifically, a willful blindness instruction is proper when there is evidence to "support the inference that defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Brandon*, 17 F.3d 409, 452 (1st Cir.1994) (quoting *United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir.1991)).

Bilis challenges the propriety of the willful blindness instruction on two grounds. First, Bilis argues that he never claimed lack of knowledge of the drug dealing taking place in the High Street Café. Bilis points to the fact that he voluntarily met with officers of the WPD to discuss the issue of drug dealing in his bar. Bilis claims that this visit, by itself, wholly negates the possibility that he lacked knowledge of the drug activities in the bar. Second, Bilis argues that his visit to the police also undermines any claim that he "consciously engaged in a course of deliberate ignorance" of the drug dealing taking place in the High Street Café.

With respect to Bilis's first argument, we conclude that his 1996 visit to the WPD did not preclude the giving of the willful blindness instruction. During Bilis's visit to the police he admitted only that he "speculated" that individuals were dealing drugs in the bar. Bilis disclaimed any specific or definite knowledge of drug activities or dealers. He testified: "I don't think I actually seen anything where I could say I had knowledge ... Speculation is one thing. Knowing is a different thing." We conclude that Bilis's denial of specific or definite knowledge satisfies

the first prerequisite for the giving of the willful blindness instruction.

Bilis's second argument fares no better. Bilis's own testimony clearly supports the inference that he purposely avoided learning details about the drug dealing in the bar. Specifically, Bilis testified that he observed plastic baggies in the bathroom and that he mentioned something to Michael Plasse about them: "And I got in an argument ... with him [and] he ended up being thrown out [of the bar] for sixty days." When asked what he thought the plastic bags were used for, Bilis responded: "I have no idea ... What was on the other end of [the plastic knot top], I don't know." This testimony clearly supports the inference that Bilis purposely avoided learning about the drug dealing taking place in his bar.

Officer Healy's testimony further supports this inference. She described the drug business environment at the High Street Café as "competitive" and testified: "There were several people there, all selling drugs.... Sometimes there were so many of them there ... I had to wait until one person left so I could make a drug purchase." Officer Healy further testified that she made several drug transactions while sitting on a stool directly in front of the bar. This testimony coupled with Bilis's own admission that he "speculated" about drug activity in his bar further supports the inference that Bilis was aware of a high probability of drug dealing in the High Street Café and purposely contrived to avoid learning all of the facts. *See Brandon,* 17 F.3d at 452.

■ The fact that the government also offered evidence to support the theory that Bilis possessed direct knowledge of drug dealing did not render the willful blindness instruction inappropriate. This court has rejected the argument that proof of direct knowledge precludes a willful blindness instruction that is otherwise appropriate:

> As long as separate and distinct evidence supports a defendant's deliberate avoidance of knowledge and the possibility exists that the jury does not credit the evi-

dence of direct knowledge, a willful blindness instruction may be appropriate. *Brandon,* 17 F.3d at 452 n. 74. Two of the government witnesses who testified as to Bilis's direct knowledge of and participation in drug activities had an incentive to cooperate with the government.[2] As the district judge noted at sentencing, it is possible that the jury did not find some or any of their testimony credible. For example, the jury could have credited the witnesses' testimony concerning the extent of the drug dealing in the High Street Café, while rejecting the testimony related to Bilis's actual involvement in drug deals. Even without the testimony of these witnesses, separate and distinct evidence supported the government's alternate theory of willful blindness. The instruction was warranted under the circumstances.

## III.  CONCLUSION

Based on the foregoing, we **affirm** the judgment of the district court.

---

**2.**  Tina LeMay and William Sblacers were arrested on September 23, 1997 and subsequently indicted for various drug offenses. At trial, they testified pursuant to plea agreements they had entered into with the government.