# United States Court of Appeals
## For the First Circuit

---

No. 08-1493

UNITED STATES OF AMERICA,

Appellee,

v.

FRANKLIN AZUBIKE,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

---

James H. Budreau for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, was on brief
for appellee.

---

April 29, 2009

---

**LYNCH**, **Chief Judge**.  After this court vacated a prior conviction and remanded for a new trial, Franklin Azubike was again convicted for conspiring to distribute heroin and possessing heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846.  This court had vacated his prior 2006 conviction and had remanded to the district court, finding that although there was sufficient evidence to uphold the jury's verdict, prosecutorial error required a new trial.  United States v. Azubike (Azubike I), 504 F.3d 30, 31 (1st Cir. 2007).  He appeals from his 2008 conviction; this time, we affirm.

I.

The background for this case is detailed in our previous opinion.  See Azubike I, 504 F.3d at 32-34.  We briefly recount the facts essential to this appeal.

The story begins with a briefcase filled with heroin. The briefcase had been sent by FedEx to Richard Mukasa, a Malden resident, from Solomon Lui, a Sudanese businessman living in Uganda.  Solomon had set up a sham courier service for the purpose of importing heroin into the United States.  Mukasa had been told by Solomon that he would receive packages containing African arts and crafts, intended for Sudanese refugees in the country; the refugees' relatives would pick up the packages and pay Mukasa a

small fee. Mukasa was not aware of the true nature of these shipments.[1]

Immigration and Customs Enforcement ("ICE") intercepted the package containing the briefcase in Memphis, Tennessee, on February 13, 2005. The airbill indicated that the contents of the package were "African design cloths," and the briefcase did in fact contain several brightly colored cloths -- but the briefcase was also unusually heavy. An x-ray of the briefcase revealed that there were two secret compartments built into its walls. Within these compartments, approximately two kilograms of high-potency heroin were expertly hidden. The wholesale value of the heroin was approximately $120,000.

On February 15, an undercover police officer dressed as a FedEx delivery person delivered the package to Mukasa. After Mukasa signed for the package, he was approached by law enforcement agents from ICE and the state police. He informed the agents that he did not know what was in the briefcase but that he had been suspicious, and he agreed to cooperate with the government.

The next day, at the agents' direction, Mukasa called Solomon; the call was recorded. Mukasa told Solomon he knew what was in the package. He said he had not opened it, but that he had lifted it, and "it was real heavy my friend." Mukasa demanded that

_____

[1] Mukasa was sent two other packages by Solomon before receiving the ones at issue in this case. The details surrounding these prior shipments are not important.

Solomon give him more money to compensate for putting him at risk. Solomon agreed to pay Mukasa $1500 for handling the package, and told him a man named "Johnson" would call to arrange the exchange.[2]

Mukasa received a call from "Johnson," who was later identified as Peter Ike, the following day. Initially confused by the voice, Mukasa asked Ike if he was Solomon; Ike responded, "Not Solomon, Johnson. . . . Yah, sound like Solomon." The two arranged to meet in a movie theater parking lot in Revere, Massachusetts, on February 18. The meeting went according to plan, and Mukasa handed Ike the briefcase in exchange for $1500.

On March 4, 2005, Mukasa received another briefcase from Solomon. This briefcase also contained approximately two kilograms of heroin. That night, Solomon called Mukasa to confirm the package had been delivered; he said "Mike" would call to arrange an exchange. "Mike," who was later identified as Roy Oki, called Mukasa on March 8, and said he would be sending "Franklin" to pick up the briefcase. He indicated that "Franklin" was coming from New York and would call Mukasa when he was nearby.

On March 11, 2005, a Friday, Mukasa received a call from defendant Franklin Azubike, who identified himself as "Al Hajji," his childhood nickname. He asked Mukasa, "Did Mike tell you about

---

[2] Mukasa also asked Solomon whether John Kaggwa, the man who had introduced Solomon to Mukasa, "[knew] this business." Solomon responded that he was a "confidential man" and that "I have nobody who know[s] this business."

-4-

me?" Mukasa answered "yes." Azubike told Mukasa that "Mike" had delayed him, but that he was now on his way to Boston. Mukasa, however, told Azubike that the "stuff" was not yet ready; the package was being kept by a friend, and he could not retrieve it until Sunday. Azubike was irritated at the delay, and the two argued about who was at fault. Azubike said he would call Mukasa back. After trying and failing to reach "Mike," Azubike did so, and the two continued to argue.

In a later phone call that day, Azubike continued to press Mukasa for an earlier meeting date. As the argument continued, Mukasa said, "Solomon called me . . . [l]ike ten days ago, and I've been here all the time." Azubike responded, "No, no, no, forget about that. What is going to happen? Forget about what happened." Mukasa then told Azubike that the package would not be available until Monday at noon. Azubike was exasperated, but Mukasa explained that he didn't want his friend, who was keeping the briefcase, "to get involved in this stuff." "I don't want him to be suspicious," he added, "because he doesn't know much about this stuff." Azubike responded: "It's OK, it's OK. You don't have to say that on the phone. . . . Don't say nothing more, don't say anything."

Mukasa later spoke to "Mike," who assured him that his "friend" would be able to pick up the package that Monday. On Sunday, March 13, Azubike called Mukasa and the two agreed to meet

-5-

the following day around noon. The meeting was to take place in a theater parking lot in Revere.

On Monday morning, Mukasa called Azubike to say he was en route. Shortly thereafter, Azubike told Mukasa he did not like the meeting place they had agreed upon, since there were "no cars" in that parking lot; Mukasa agreed to move the meeting place to the Stop 'N Shop parking lot across the street. Azubike drove into the Stop 'N Shop parking lot in a blue Impala that had been rented in Baltimore under a different name and pulled up next to Mukasa's Jeep. Azubike handed Mukasa $2000 and then retrieved the briefcase from the trunk of the Jeep. He then opened the trunk of his car, placed the briefcase at the back, and rearranged the other luggage in the trunk so the briefcase was not visible. Azubike asked Mukasa for directions out of Boston and left the parking lot, driving south.

Azubike was stopped by Massachusetts state police a short time later, while driving on Interstate 95 South. Questioned by the officer, Azubike said he had come to Boston to visit his cousin and that he had stayed the previous night in the Colonnade Hotel. Pressed further, he was unable to tell the officer what his cousin's name was, and he did not respond when asked where his cousin lived. Azubike never asked why he had been stopped. A search of Azubike and his car revealed, among other things, $490,

a receipt for a storage locker in New York, and the briefcase. Azubike was arrested.

In a later search of the New York storage locker, officers found documents containing Ike's phone number. Azubike's telephone records also showed that, between February 1, 2005 and March 14, 2005, there were 175 calls between Azubike and Oki and three calls between Azubike and Ike. Two calls were made from Azubike's cell phone to Oki on March 14, after the briefcase was exchanged, but before Azubike was arrested; six more calls were made from Oki to Azubike the same day, after Azubike was arrested.

After a seven-day trial, Azubike was convicted and sentenced to 120 months' imprisonment. On appeal, this court rejected Azubike's challenge to the sufficiency of the evidence. Azubike I, 504 F.3d at 36-38. However, it vacated and remanded on the grounds of prosecutorial error.[3] Id. at 31.

Azubike was tried again. The evidence presented to the jury during this five-day trial was largely the same as that presented in the first trial, with a few minor differences At retrial, Mukasa did not testify as he did in the first trial about certain unrecorded conversations he had with other co-conspirators; he had also testified at greater lengths at the first trial about

---

[3] In statements to the jury, the prosecutor misstated the evidence to suggest Azubike said he knew Solomon. This court found the error was unintentional, but that it was nonetheless prejudicial, since it went to the central issue of Azubike's role in the conspiracy. Azubike I, 504 F.3d at 38-42.

certain background matters.  Moreover, at retrial the government chose not to put on the stand one of its witnesses who had been impeached during the first trial.  Defendant also presented witnesses at the second trial who testified that he and Ike were not known to be close.

More importantly, at the retrial, unlike in the first trial, the district court gave the jury a willful blindness instruction.  Over defendant's objection, the court instructed the jury:

> In deciding whether Mr. Azubike acted knowingly, you may, but need not, infer that he had knowledge of a fact if you find that he deliberately closed his eyes to a fact that otherwise would have been obvious to him.  In order to infer knowledge, you must find that two things have been established. First, that Mr. Azubike was aware of the high probability of the fact in question, second, that Mr. Azubike consciously and deliberately avoided learning of that fact; that is to say, that he willfully made himself blind to that fact. . . . [I]t is important to bear in mind that mere negligence or mistake in failing to learn the fact is not sufficient.  There must be a deliberate effort to remain ignorant of the fact.

Azubike was convicted on the same counts on February 29, 2008, and was sentenced to 72 months' imprisonment.

II.

Defendant raises three challenges on appeal: (1) that the evidence was not sufficient to support the conviction; (2) that the court erred in giving a willful blindness instruction to the jury;

-8-

and (3) that the court erred in denying his motion for a new trial. We reject all three.

A.        Sufficiency of the Evidence

We review preserved challenges to sufficiency of the evidence de novo. United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (1st Cir. 2008). "In assessing sufficiency, we examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution . . . , including all plausible inferences drawn therefrom." Id. "If, in this light, any reasonable jury could find all the elements of the crime beyond a reasonable doubt, we must uphold the conviction." United States v. Lizardo, 445 F.3d 73, 81 (1st Cir. 2006); see also Cruz-Rodríguez, 541 F.3d at 26; Azubike I, 504 F.3d at 36. The court "need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record." United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006) (quoting United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001)) (internal quotation marks omitted).

Defendant argues the court erred in failing to grant his motion for judgment of acquittal because the government failed to prove an essential element of the offenses for which he was convicted: that he "knowingly and intentionally" possessed a controlled substance with intent to distribute. To convict

defendant under 21 U.S.C §§ 841(a)(1) and 846, the government had to prove beyond a reasonable doubt that defendant knew the briefcase he received from Mukasa contained a controlled substance. Azubike I, 504 F.3d at 36-37 & n.6; see also United States v. Thomas, 114 F.3d 403, 405 (3d Cir. 1997).

Defendant quite reasonably concedes that a rational jury could conclude from the evidence presented that he knew the briefcase contained something illegal.  He argues, however, that there was insufficient evidence to show he knew the briefcase contained drugs -- as opposed to some other form of contraband.

We do not take into account the fact that we previously found the evidence from the first trial sufficient, but independently conclude that the evidence presented at retrial was sufficient to reach the same conclusion.

First, a jury could rationally infer that defendant knew what was in the briefcase and that these contents should not be discussed over the phone from the recorded conversations between him and Mukasa -- specifically his response to Mukasa's comments about not wanting to involve his friend, who was holding the briefcase.  Mukasa said he did not want to make the friend suspicious, "because he doesn't know much about this stuff." Azubike cut Mukasa off to stop any further description, saying, "You don't have to say that on the phone. . . . Don't say nothing more, don't say anything."  Azubike did not want to run the risk of

direct description of the "stuff" on a phone which might be tapped. From this, a jury could infer that he knew exactly what the "stuff" was.

Second, a jury could infer that Azubike knew the contents of the briefcase from his close association with Oki and Ike, who had a direct relationship with Solomon, the source of the drugs.[4] The jury was presented with defendant's statements indicating he reported to "Mike," the numerous phone calls between defendant, Oki, and Ike, and the fact that Ike's contact information was found in defendant's storage locker.

Third, Azubike was entrusted with a large amount of drugs. As we have noted, "drug organizations do not usually take unnecessary risks by trusting critical transactions to outsiders." Azubike I, 504 F.3d at 37 (citing United States v. Thomas, 467 F.3d 49, 54 (1st Cir. 2006)). The jury had before it evidence regarding Solomon's attempts at secrecy and in any event could reach the common-sense conclusion that if a large drug operation trusted defendant to transport such a significant quantity of heroin, it is unlikely he was ignorant of the contents of the briefcase. See Thomas, 467 F.3d at 54; United States v. DiMarzo, 80 F.3d 656, 661 (1st Cir. 1996).

---

[4] Solomon told Mukasa that he would be receiving calls from Ike and Oki, although he referred to both by pseudonyms. Ike also acknowledged to Mukasa that he "sound[s] like Solomon," thus suggesting he was familiar with Solomon.

-11-

Fourth, the modus operandi of the crime was the same as that of drug transactions sadly common in this geographic area: the use of multiple couriers, the drugs being hidden in suitcases, the drugs being of the right weight to be carried, the meeting in the parking lot.  This, in turn, also supports the jury's conclusion that defendant knew he was transporting drugs, and not some more exotic form of illegal material.  See United States v. Hurley, 63 F.3d 1, 12 (1st Cir. 1995) (concluding in a money laundering prosecution that there was sufficient evidence that defendant knew the source of the money was drugs because, although "[t]here are plenty of cash-generating businesses[,] . . . among those that require the illicit laundering of funds, the drug business is notorious and preeminent"); see also United States v. Cruz-Arroyo, 461 F.3d 69, 74 (1st Cir. 2006) ("[J]urors are neither required to divorce themselves from their common sense nor to abandon the dictates of mature experience."  (quoting United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992)) (internal quotation marks omitted)).

Although this is sufficient to uphold the verdict, we address defendant's contention that, in his view, the prosecution's evidence at retrial was weaker than the evidence presented the first time around and so the evidence was insufficient.  For example, defendant notes that Mukasa testified at greater lengths in Azubike I about the two packages he received before the

-12-

briefcases in question, the other couriers, and the involvement of "Mike." Mukasa also testified in the first trial about certain unrecorded conversations with other co-conspirators and how he became suspicious about the contents of the packages when he learned Nigerians were involved. This evidence may have been helpful as background, but was unrelated to the question of Azubike's knowledge; its omission in the second trial in no way undermined the jury's ability to rationally infer that defendant knew the contents of the briefcase.

Defendant points to one potentially relevant difference. At the retrial, Azubike presented witnesses who testified that he and Ike were not known to be close. But the jury was not required to credit this testimony, and there was other evidence that the two were connected. Regardless, this difference did not render the evidence insufficient.

If anything, the evidence presented at the second trial was less vulnerable to challenge than that in Azubike I. At the retrial, the government chose not to present testimony from a witness who was impeached at the original trial. Moreover, at the original trial, Mukasa was impeached on the basis of his testimony regarding certain unrecorded conversations he had with other co-conspirators; Mukasa did not testify about these conversations at the second trial.

Beyond that, assuming there was no error in the giving of the willful blindness instruction at retrial, an inquiry set forth next, the evidence was sufficient on this theory as well.  See Thomas, 467 F.3d at 54; United States v. Jones, 10 F.3d 901, 908 (1st Cir. 1993); United States v. St. Michael's Credit Union, 880 F.2d 579, 586 (1st Cir. 1989); see also United States v. Anthony, 545 F.3d 60, 64 (1st Cir. 2008) ("A willful blindness instruction informs jurors that they may impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps."  (quoting United States v. Griffin, 524 F.3d 71, 77 n.4 (1st Cir. 2008)) (internal quotation marks omitted)); United States v. Heredia, 483 F.3d 913, 918 (9th Cir. 2007) (en banc).

Thus, the evidence was sufficient to support the conviction.

B.      Willful Blindness

Defendant also argues the court erred by giving a willful blindness instruction at the retrial.  Defendant has preserved his challenge to the giving of the instruction.  Even if we employ de novo review, we find the district court did not err in giving this instruction.[5]

---

     [5]  This court has utilized both de novo and deferential standards of review.  Anthony, 545 F.3d at 64; accord Lizardo, 445 F.3d at 85; United States v. Epstein, 426 F.3d 431, 440 n.5 (1st Cir. 2005); see also Heredia, 483 F.3d at 921 n.11 (discussing circuit split on this issue).  We have at times reviewed the

A willful blindness instruction is appropriate if (1) a defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge. Anthony, 545 F.3d at 64 (citing Griffin, 524 F.3d at 78); accord, e.g., United States v. Epstein, 426 F.3d 431, 440 (1st Cir. 2005). Defendant argues the facts presented at his second trial were insufficient to justify the instruction.

In determining whether the facts suggest the type of deliberate avoidance warranting a willful blindness instruction, "we must consider whether the record evidence reveals 'flags' of suspicion that, uninvestigated, suggest willful blindness." Epstein, 426 F.3d at 440 (quoting United States v. Coviello, 225 F.3d 54, 70 (1st Cir. 2000)) (internal quotation marks omitted). Direct evidence of willful blindness is not required; what is needed are sufficient warning signs that call out for investigation or evidence of deliberate avoidance of knowledge. United States v. Singh, 222 F.3d 6, 11 (1st Cir. 2000); see also Keene, 341 F.3d at 83. The evidence is reviewed in the light most favorable to the government. Singh, 222 F.3d at 11; see also United States v. Lalley, 257 F.3d 751, 755 (8th Cir. 2001).

question de novo, see United States v. Keene, 341 F.3d 78, 83 (1st Cir. 2003), and at other times for abuse of discretion, see United States v. Coviello, 225 F.3d 54, 70 (1st Cir. 2000); we have also suggested, quite reasonably, that the level of scrutiny may depend on the nature of the challenge, see Lizardo, 445 F.3d at 85 n.6.

-15-

It is possible that from defendant's point of view, he may not have cared what the exact nature of the illegal contents of the briefcase were.  This is doubtful, however, given that the risks to him of carrying the briefcase may well have turned on what the contents were and what their value was.  Included among those risks were high federal sentences for convicted heroin traffickers.  See 21 U.S.C. § 841(b) (providing for different minimum sentences based on the amount and type of drugs involved).  The jury could easily have concluded that defendant went out of his way to avoid learning the contents of the briefcase, if he did not already know.  When Mukasa began discussing the contents of the briefcase, referring to it in coded language, defendant asked him to stop, saying, "Don't say nothing more, don't say anything."  This evidence clearly supports the inference that defendant was on notice but purposefully avoided learning the contents of the briefcase.  See United States v. Bilis, 170 F.3d 88, 93 (1st Cir. 1999); see also Lizardo, 445 F.3d at 85; Epstein, 426 F.3d at 440-41; Coviello, 225 F.3d at 70-71.

Defendant argues that the instruction was nonetheless improper because, as a matter of law, the evidence that supported the instruction could not be the same as evidence used to support a finding of actual knowledge.  He argues that a willful blindness instruction may never be given in such circumstances, relying on our statement in a footnote in United States v. Brandon, 17 F.3d

-16-

409 (1st Cir. 1994), quoted in Bilis, 170 F.3d at 93, that, "[a]s long as separate and distinct evidence supports a defendant's deliberate avoidance of knowledge and the possibility exists that the jury does not credit the evidence of direct knowledge, a willful blindness instruction may be appropriate." Brandon, 17 F.3d at 452 n.74. Both defendant and the dissent take the phrase "separate and distinct" out of context and use it for a proposition which is not our law.

This quoted language stands for the unremarkable proposition that when the government offers evidence of direct knowledge, this does not preclude a willful blindness instruction. See Bilis, 170 F.3d at 93 ("The fact that the government also offered evidence to support the theory that [defendant] possessed direct knowledge . . . did not render the willful blindness instruction inappropriate."); Brandon, 17 F.3d at 452 n.74 ("We reject the argument that proof of direct knowledge precludes a willful blindness instruction that is otherwise appropriate."). Indeed, Brandon used this language in a footnote to summarize the holdings in two cited cases. As the two cases cited make clear, what the "separate and distinct" requirement means is that when the evidence presented at trial provides the jury with only a binary choice between actual knowledge and innocence, a willful blindness instruction is inappropriate. See United States v. Lizotte, 856 F.2d 341, 343 (1st Cir. 1988) (rejecting defendant's claim that a

-17-

willful blindness instruction was inappropriate because there would be no evidence of willful blindness if the jury did not credit the witness that testified to defendant's direct knowledge, on the grounds that the jury could have found the witness "credible in part and incredible in part," and thus "there was evidence before it justifying the inference [of willful blindness]"); see also United States v. Ochoa-Fabian, 935 F.3d 1139, 1142 (10th Cir. 1991) ("While a deliberate ignorance instruction is not appropriate when the evidence points solely to direct knowledge, where, as here, the evidence supports both actual knowledge and deliberate ignorance, the instruction is properly given."). It does not follow from this, however, "that evidence must be placed in either an actual knowledge or a deliberate ignorance category. It is permissible for the government to present some evidence supporting both theories and some of the government's evidence might be relevant to both actual knowledge and deliberate ignorance." Griffin, 524 F.3d at 79 (quoting United States v. Carrillo, 435 F.3d 767, 784 (7th Cir. 2006)). "Separate and distinct" evidence of willful blindness exists where, as in this case, the jury could take one view of the evidence and reasonably conclude that the defendant had actual knowledge or, alternatively, reject that view of the evidence but still reasonably conclude instead that the defendant was willfully blind.

That we have recognized a "requirement" that there be "separate and distinct" evidence, Anthony, 545 F.3d at 65 n.7, and that we found the requirement to have been met in Bilis and Anthony, says little about the meaning of this requirement. This court has never read the phrase "separate and distinct," as the dissent urges in its novel construction, to create a requirement that the set of evidence supporting an inference of willful blindness cannot be contained within a larger set of evidence that, in the alternative, could support a finding of actual knowledge, or even that the two sets cannot completely overlap. Further, the dissent is incorrect in stating that there is "complete overlap" between the evidence supporting willful blindness and the evidence supporting actual knowledge in this case. Although the phone conversation in which defendant urged Mukasa to "say nothing more" about the "stuff" could support an inference of either actual knowledge or, in the alternative, willful blindness, substantial amounts of other evidence, discussed in section II.A, supra, was presented to support exclusively a finding of actual knowledge.

Nor has this court -- or any other circuit -- ever found a willful blindness instruction inappropriate on the basis of such overlap. Indeed, we have explicitly cautioned that this phrase should not be read "too narrow[ly]." Anthony, 545 F.3d at 65 n.7 ("[T]here is always some overlap between the evidence that a defendant knew a fact and the evidence that, if he did not know it,

-19-

he ought to have known it."). In Griffin, moreover, we found a willful blindness instruction appropriate where the only evidence that supported an inference of willful blindness also, alternatively, supported a finding of actual knowledge. See Griffin, 524 F.3d at 78-79 (finding that the fact that defendant reported sales income from two companies but failed to discuss sales income she received from another company with her tax preparers was sufficient, "[o]n the one hand, . . . [to] support[] the theory that [the defendant] deliberately avoided discussing her income from [the third company] in order to avoid actual knowledge," while, "[o]n the other hand, this evidence is also consistent with the theory that [defendant] knew of her legal obligation to report this income but simply chose not to report it").

In the present case, as in Griffin, "[e]vidence [was] presented at trial [that] may support either a finding of actual knowledge or a finding of willful blindness," and "these theories can coexist." Id. The evidence presented did not require the jury to make a binary choice between actual knowledge and innocence. The jury could reasonably infer from defendant's conversation with Mukasa that he was trying to deliberately avoid knowledge of what the "stuff" was; or, it could have rejected such an inference and reasonably inferred instead from this conversation and from the other evidence presented that defendant knew exactly what was in

the briefcase but was merely trying to avoid detection.  Thus, "separate and distinct" evidence supported the willful blindness instruction.

Assuming there is sufficient evidence on which a jury could reasonably find either actual knowledge or willful blindness, defendant cannot claim to have been unfairly prejudiced by the court's allowing the jury to convict on the basis of either theory. There is no reason why a jury should be precluded from reaching one of these reasonable conclusions simply because there is no single piece of evidence that points exclusively to willful blindness, rather than to willful blindness or actual knowledge in the alternative.  Such a rule is not only illogical, it would lead to inconsistent and unjust outcomes.

The district court did not err in giving the willful blindness instruction, which was supported by sufficient facts.  As is clear from what we have said, there was also sufficient evidence to support defendant's conviction on that theory.

C.      New Trial Motion

For the same reasons that defendant is not entitled to acquittal for lack of sufficient evidence, he is not entitled to a new trial on the grounds that the jury verdict was against the weight of the evidence.  Azubike I, 504 F.3d at 38.

-21-

III.

The conviction is <u>affirmed</u>.


**-Dissenting Opinion Follows-**

**TORRUELLA**, <u>Circuit Judge</u> **(Dissenting)**.  We have before us the second round of this case.  <u>See</u> <u>United States</u> v. <u>Azubike</u>, 504 F.3d 30 (1st Cir. 2007) [hereinafter "<u>Azubike I</u>"].  In <u>Azubike I</u>, we vacated the conviction and remanded the case for retrial because the prejudicial statements of the prosecution invalidated the outcome.  By retrying appellant, the government has now had two shots at proving beyond a reasonable doubt all of the essential elements of the crimes charged.  As in <u>Azubike I</u>, whether Azubike "knowingly and intentionally" possessed a controlled substance under 21 U.S.C. § 841(a) is the linchpin of this controversy.  In my view, the government's evidence once again does not permit a rational jury to find this essential element beyond a reasonable doubt.  In addition, and unique to the instant case, the district court gave a fatal willful blindness instruction, one which, in itself, is sufficient to flaw Azubike's latest conviction.  For these reasons, I respectfully dissent.

### A.  Sufficiency of the Evidence

In my dissenting opinion in <u>Azubike I</u>, I concluded that the government failed to establish Azubike's criminal scienter beyond a reasonable doubt.  504 F.3d at 42-43.  A review of the record in the present appeal leaves me in no better position to find that the government has met its constitutional burden in this respect.  <u>See</u> <u>United States</u> v. <u>Nieves-Castaño</u>, 480 F.3d 597, 601 (1st Cir. 2007) ("[K]nowledge that one is guilty of <u>some</u> crime is

not the same as knowledge that one is guilty of the crime <u>charged</u>." (emphasis in the original)); <u>see also</u> <u>United States</u> v. <u>Cruz</u>, 363 F.3d 187, 198-99 (2d Cir. 2004) (holding that there was insufficient evidence to conclude defendant had specific knowledge that drugs were the object of the transaction); <u>United States</u> v. <u>Cartwright</u>, 359 F.3d 281, 286, 290-91 (3d Cir. 2004) (holding that the government failed to show sufficient evidence that lookout knew transaction involved drugs even though he knew the transaction was illegal); <u>United States</u> v. <u>Fitz</u>, 317 F.3d 878, 882-83 (8th Cir. 2003) (holding that despite giving false name and other factors showing defendant knew transaction was probably not legitimate, evidence was insufficient to conclude knowledge of presence of drugs); <u>United States</u> v. <u>Thomas</u>, 114 F.3d 403, 405-06 (3d Cir. 1997) (holding evidence insufficient to conclude defendant had knowledge that drugs were involved in the transaction despite his knowledge that the transaction was illegal). In fact, if anything, I am even more skeptical than in <u>Azubike I</u> that the government met its burden this second time around, for I find that the record is now factually weaker. It appears that the government was somewhat complacent in its presentation of evidence in the present case, perhaps being lulled into that condition by the outcome in <u>Azubike I</u>.[6]

---

[6] The government presented far more evidence in <u>Azubike I</u> as compared to the instant case. First, in <u>Azubike I</u>, Richard Mukasa, the original addressee of the briefcase with the hidden

-24-

Specifically, I disagree with several arguments the majority makes in support of its sufficiency holding. First, I consider neither Azubike's "close association" with Oki and Ike, nor the fact that Azubike was entrusted with a briefcase that was found to contain drugs, to be probative of Azubike's knowledge of the contents of the briefcase under the circumstances of this case. The majority maintains that the jury could use its "common-sense" to conclude that Azubike was not ignorant of the contents of the briefcase because a large drug operation trusted him to transport a significant quantity of heroin. However, in this particular drug operation, the jury should not have been able to rely on this common-sense conclusion because Solomon entrusted Mukasa, who also had no knowledge of the true nature of the shipments, to receive and distribute the "unusually heavy" briefcases. In addition, the evidence shows that Solomon made substantial efforts to conceal relevant aspects of the operation from those upon whom he relied to

compartments containing heroin sent from Uganda, testified in significant detail about prior briefcases, the couriers, and of Roy Oki's involvement and place in the conspiracy. Mukasa barely discusses these matters in the present case. Second, in Azubike I, Mukasa testified about unrecorded conversations between himself and John Kaggwa, a Ugandan lawyer who introduced Solomon Lui, a Sudanese businessman living in Uganda, to Mukasa. Solomon was the mastermind of the drug smuggling operation. In the present case, Mukasa did not testify about these unrecorded conversations. Third, in Azubike I, this court considered various unrecorded statements between Mukasa and co-conspirators in its sufficiency of the evidence analysis. These statements were not offered into evidence in the trial of the present case. Finally, State Trooper Coffey testified extensively in Azubike I, but not in the present trial.

distribute the briefcases.  Given Solomon's penchant for secrecy, evidence of frequent discussions between Azubike and Oki and Ike is minimally probative of Azubike's knowledge of the briefcase's contents.

Second, I also disagree with the majority that the modus operandi of this criminal enterprise would permit a jury to conclude beyond a reasonable doubt that Azubike knew he was transporting drugs.  A modus operandi involving multiple couriers, briefcases with secret compartments, and a meeting in the parking lot is consistent with other forms of high-value contraband activity such as smuggling diamonds, gems commonly smuggled from Africa into the United States.  See generally United States Government Accountability Office, GAO 06-978, Conflict Diamonds: Agency Actions Needed to Enhance Implementation of the Clean Diamond Trade Act (2006) [hereinafter GAO Diamond Report].

Lastly, I disagree with the majority's reliance on the conversation between Azubike and Mukasa, where Azubike states that "You don't have to say that on the phone . . . . Don't say nothing more, don't say anything" in response to Mukasa's comment that Mukasa's friend did not "know much about this stuff."  Even when viewed in the light most favorable to the government, this exchange would not permit a rational juror to infer that Azubike knew what the "stuff" was.  Rather, when read in context, this exchange merely reflects Azubike's knowledge that the "stuff" was illegal

-26-

and indicates his reluctance to discuss the illegal activity on the phone.  See Cruz, 363 F.3d at 198-99; Fitz, 317 F.3d at 882-83.

The unmistakable reality is that the majority assumes too much, and places the bar that the government must clear at too low a level.  Although the government is allowed to prove by circumstantial evidence that Azubike knew that the briefcase in question contained drugs, it only succeeded in establishing that Azubike knew something illegal was afoot.  Any conclusion by the jury beyond that, specifically imputing to Azubike knowledge of the contents of the briefcase, was the product of pure speculation (influenced, perhaps, by an improper willful blindness instruction, which I will discuss infra).  This is particularly true when one considers that the burden is proof beyond a reasonable doubt.  See United States v. Idowu, 157 F.3d 265, 270 (3d Cir. 1998) (holding that there was insufficient evidence that the object of the transaction was drugs and that "no reasonable jury could have concluded that the government had met its burden of proof, which requires proof beyond a reasonable doubt"); United States v. Olivo-Infante, 938 F.2d 1406, 1409 (1st Cir. 1991).

As I stated in Azubike I, the evidence the government presented in this case would have been just as consistent with that of a case involving the smuggling of diamonds or any other high-value contraband from Africa.  504 F.3d at 43.  Lest this assertion be considered also in the realm of speculation, I suggest that

-27-

diamond smuggling from Africa into the United States, one of the world's largest consumers of industrial and gem grade diamonds, is a reality which has been confronted by our government with considerable attention and limited success. See generally GAO Diamond Report.

It may be that the majority opinion is part of an inexorable trend in the relaxation and degradation of the constitutional standards that are now to be applied in criminal proceedings involving controlled substances. If that is the case, it is one parade in which I am not willing to march. See generally Kevin Jon Heller, Note, Whatever Happened to Proof Beyond a Reasonable Doubt? Of Drug Conspiracies, Overt Acts, and United States v. Shabani, 49 Stan. L. Rev. 111, 142 (1996) (noting that "[i]n case after case involving drugs, the courts have whittled away vital protections for the accused" and that "the standard of proof beyond a reasonable doubt [should be added] to the long list of vital protections sacrificed in the name of the War on Drugs") (internal quotation marks omitted); see also Tucker v. Palmer, 541 F.3d 652, 671 (6th Cir. 2008) (Keith, J., dissenting) (noting the court's responsibility to ensure "the constitutional guarantee [of proof beyond a reasonable doubt]" and that, in that case, "[t]he majority turn[ed] a blind eye to this basic constitutional responsibility and undermine[d] the concept of equal justice under the law"); United States v. Manqual-Corchado, 139 F.3d 34, 49 (1st

Cir. 1998) (McAuliffe J., dissenting in part) ("'[T]he sufficiency of the evidence warrants particular scrutiny when the evidence strongly indicates that a defendant is guilty of a crime other than that for which he was convicted, but for which he was not charged.'") (quoting United States v. Salamanca, 990 F.2d 629, 638 (D.C. Cir. 1993)); Hon. Jon O. Newman, Beyond "Reasonable Doubt," 68 N.Y.U. L. Rev. 979, 989 (1993) ("[I]n the federal courts, the primary expositors of federal requirements, we have insisted that juries be instructed that they must be persuaded beyond a reasonable doubt, but we have not insisted on meaningful observance of this standard as a rule of law for testing the sufficiency of the evidence.").

The evidence was equally consistent with Azubike possessing contraband other than controlled substances. Thus, because the government failed to prove an essential element of the crimes charged by proof beyond a reasonable doubt, the Constitution mandates acquittal on both charges against him.

**B. Willful Blindness Instruction**

The district court's failure to grant Azubike's Rule 29 motion was exacerbated by its giving a willful blindness instruction. On this record, that instruction amounted to a bolstering of the government's case on the issue of knowledge which I have just discussed.

-29-

We have held that "[a] willful-blindness instruction 'is proper if a defendant claims a lack of knowledge, the facts suggest a conscious course of deliberate ignorance, and the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge.'" United States v. Keene, 341 F.3d 78, 83 (1st Cir. 2003) (quoting United States v. Masse, 816 F.2d 805, 812 (1st Cir. 1987)); see also United States v. Singh, 222 F.3d 6, 11 (1st Cir. 2000); United States v. Cunan, 152 F.3d 29, 39 (1st Cir. 1998). Further, we have stressed that a willful blindness instruction "is proper when there is evidence to support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." United States v. Brandon, 17 F.3d 409, 452 (1st Cir. 1994) (emphasis added) (quoting United States v. Rivera, 944 F.2d 1563, 1571 (11th Cir. 1991)).

Most relevant to the present case, however, is our requirement that a willful blindness instruction should not be given unless the evidence of willful blindness is "separate and distinct" from the evidence of actual knowledge. United States v. Bilis, 170 F.3d 88, 93 (1st Cir. 1999) (reiterating the rule in this circuit that "proof of direct knowledge [does not] preclude[] a willful blindness instruction that is otherwise appropriate: 'As long as separate and distinct evidence supports a defendant's

deliberate avoidance of knowledge and the possibility exists that the jury does not credit the evidence of direct knowledge, a willful blindness instruction may be appropriate.'" (quoting Brandon, 17 F.3d at 452 n.74) (emphasis added)). Such evidence does not exist in this record.

It was practically undisputed, and without serious question established, that the government proved that Azubike knew that some criminal activity was taking place and that he was an active participant. The majority relies on the phone conversation[7]

---

[7] The relevant part of the conversation between Mukasa and Azubike is as follows:

H [Azubike]: I'm talking about him getting it Saturday night and giving it to me Sunday morning, morning, morning, 8 o'clock.
CI [Mukasa]: Monday morning we cannot meet. It must be midday because it's not near here. He works uh like, uh uh, you know Swampscott? I don't think . . . you don't live in this place. It's about an hour and a half drive from here.
H: My God.
CI: Yah.
H: Oh, no.
CI: So if he works from Swampscott he has to get here by, if he leaves work at 8, by the time he gets here it's about 9:30 and then I get an arrangement. We can meet at like 12 noon. That's if he works on Saturday.
H: Why 12 noon?
CI: I, I, I don't want him to get involved in this stuff, so because, it's between me and you and the other guy, me and you . . . I don't want him to be involved.
H: I know, but what I am saying is this, is think about this
CI: You know I . . .
CI: Hold on a minute
H: . . . And I'll come out
CI: I don't want him to be suspicious, because he does not know much about this stuff. You know?
H: It's ok, it's ok. You don't have to say that on the phone.
CI: If I, if I, yah. I try . . .
H: Don't say nothing more, don't say anything.

-31-

between Mukasa and Azubike to support either an inference that Azubike knew the contents of the briefcase or one that Azubike engaged in a "conscious course of deliberate ignorance." As I stated above, I believe that this evidence merely supports an inference that Azubike was involved with activities and actions aimed at avoiding detection by law enforcement. It is clear that Azubike was simply uncomfortable discussing the illegal activity on the phone. This evidence does not remotely suggest that Azubike was deliberately evading knowledge of the contents of the briefcase.

In addition, the instruction allowed the jury to rely on evidence that was not "separate and distinct" from the evidence presented by the government to establish Azubike's actual knowledge of the contents of the briefcase. This instruction allowed the jury to speculate improperly that Mukasa's conversation with Azubike created an inference of avoidance, when no such inference was permitted based on evidence barred by the "separate and distinct" rule. It also may have tipped the scales in favor of the government's paper-thin case.

The majority states that I take the phrase "'separate and distinct' out of context and use it for a proposition which is not our law." The majority then explains that "what the 'separate and distinct' requirement means is that when the evidence presented at trial provides the jury with only a binary choice between actual

-32-

knowledge and innocence, a willful blindness instruction is inappropriate."

I disagree that I am taking the phrase "separate and distinct" out of context in light of our pronouncements in Brandon and Bilis. In Brandon, a case involving a real estate broker's scheme to obtain loan financing by fraudulently representing investors' down payments, the court pointed to evidence of willful blindness "separate and distinct" from evidence it considered to show actual knowledge. 17 F.3d at 452 n.74. This included evidence that the defendant "tried to avoid learning of particular buyers' use of dischargeable mortgages for their down payments" and that the defendant told a prospective buyer that "he 'didn't want to know anything about [the second mortgages].'" Id. Similarly, in Bilis, where we considered whether a bartender was willfully blind to drug activity in his establishment, we pointed to evidence that the defendant purposely avoided learning about drug dealing taking place in his bar. 170 F.3d at 93. We deemed this evidence "separate and distinct" from evidence demonstrating the defendant's direct knowledge of drug activity in his bar. Id.

Even in United States v. Anthony, decided less than six months ago, our most recent case on point, and one where we cautioned against taking "too narrow a view" of the "separate and distinct" rule, 545 F.3d 60, 65 n.7 (1st Cir. 2008), we took the same analytical approach towards "separate and distinct" evidence

-33-

that we applied in Bilis and Brandon. In Anthony, we reaffirmed that there was a "'separate and distinct' requirement," id. (emphasis added), and proceeded to cite evidence going exclusively to willful blindness "separate and distinct" from evidence of actual knowledge to satisfy that requirement. Id. at 66 (pointing to "separate and distinct" evidence of willful blindness in tax evasion case where defendant, despite the fact that the law imposed a duty on him, did not consult either the most current version of the tax code or recent case law that may not have supported his argument).

It follows from Bilis, Brandon, and Anthony that the majority's newly minted definition of what "separate and distinct" evidence means is at odds with how we have applied the requirement in this circuit. To be sure, I do not disagree with the language the majority borrows from the Seventh Circuit's opinion in United States v. Carrillo for the majority's definition. 435 F.3d 767, 784 (7th Cir. 2006). It is perfectly sensible that a willful blindness instruction is inappropriate when a jury is faced with a binary choice between actual knowledge and complete innocence. Id. This rule protects against the possibility a jury will "convict a defendant on the impermissible ground that he should have known [an illegal act] was taking place" when the evidence only supports a

finding of actual knowledge.[8]  See Brandon, 17 F.3d at 452 (internal quotation marks omitted).  My disagreement with the majority, however, is that its definition of "separate and distinct" reads out the "separate and distinct" evidentiary requirement altogether.  Apparently, the majority reads our precedent to require only evidence of a "separate and distinct" mens rea for a willful blindness instruction when we have repeatedly referred to a requirement that the evidence itself be "separate and distinct" to support such an instruction.

Admittedly, there is some tension in our case law as we have remarked that "[e]vidence presented at trial may support either a finding of actual knowledge or a finding of willful blindness."  United States v. Griffin, 524 F.3d 71, 78 (1st Cir. 2008) (noting that failing to report sales income on tax returns could support an inference of deliberate avoidance or actual knowledge).  The majority compares Griffin to our case and concludes that the extent to which evidence of willful blindness and actual knowledge overlap is immaterial.  Griffin, however, sheds little light on the meaning of "separate and distinct" as presented in our case law, making no mention of this requirement.

---

[8]  Indeed, I believe this rule applies to the present case as the conversation between Mukasa and Azubike would not permit a rational jury to infer that Azubike deliberately avoided knowledge of the contents of the briefcase.

In Anthony, however, we do explore this requirement, in keeping with our line of cases.

I do not dispute that "some overlap" between the government's evidence of actual knowledge and that of willful blindness is permissible, see Anthony, 545 F.3d at 65 n.7; yet "complete overlap"[9] appears to be contrary to our earlier pronouncements regarding "separate and distinct" evidence in Bilis, 170 F.3d at 93, and Brandon, 17 F.3d at 452 n.74.

The majority may be correct that the need for "separate and distinct" evidence of willful blindness is unwise and that a literal reading of the language that introduced this requirement into our case law makes our rule broader than necessary. Yet, as explained above, subsequent to Brandon, we have adhered to this rule in Bilis and Anthony. As we have recently reiterated, the "interests of predictability are served by respecting our own prior language." Awuah v. Coverall, N. Am., Inc., 554 F.3d 7, 11 (1st Cir. 2009). Thus, I reject the majority's not so subtle attempt to circumvent circuit precedent. I do not believe the majority's definition of "separate and distinct" evidence is in keeping with

_____

[9]The majority takes issue with my use of the term "complete overlap." For the sake of clarity, I am merely noting that the sole evidence upon which the majority relies to show willful blindness (the phone conversation between Azubike and Mukasa) is also used to show actual knowledge -- i.e. the evidence of willful blindness is not "separate and distinct" from the evidence of actual knowledge. By no means am I suggesting that the government's other evidence does not go exclusively to actual knowledge.

-36-

our precedents in <u>Brandon</u>, <u>Bilis</u>, and <u>Anthony</u>, cases which have explicitly cited the "separate and distinct" rule. <u>Brandon</u>, 17 F.3d at 452 n.74 ("As long as separate and distinct evidence supports a defendant's deliberate avoidance of knowledge and the possibility exists that the jury does not credit the evidence of direct knowledge, a willful blindness instruction may be appropriate."); <u>see also</u> <u>Anthony</u>, 545 F.3d at 65 (same) (quoting <u>Brandon</u>, 17 F.3d at 452 n.74); <u>Bilis</u>, 170 F.3d at 93 (same) (quoting <u>Brandon</u>, 17 F.3d at 452 n.74); <u>id.</u> ("Even without the testimony of these witnesses, separate and distinct evidence supported the government's alternate theory of willful blindness.").

The majority's holding as to the sufficiency of the evidence supporting Azubike's conviction and the appropriateness of a willful blindness instruction here runs counter to the proper administration of the law and should be strongly rejected.

I respectfully dissent.